UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DOMINIC COTRONEO, *ET AL.*, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-1250 |
| | § | |
| SHAW ENVIRONMENTAL & | § | |
| INFRASTRUCTURE, INC., *ET AL.*, | § | |
| | § | |
| DEFENDANTS. | § | |

## MEMORANDUM AND RECOMMENDATION

This "public liability action" under the Price Anderson Act for radiation exposure in the workplace is before the court on defendants' motion for summary judgment (Dkt. 82), which was argued on September 21, 2007. The court recommends that defendants' motion be granted as to plaintiffs' claims under the Price Anderson Act, that supplemental jurisdiction over plaintiffs' remaining state law claims be declined pursuant to 28 U.S.C. § 1367(c), and that the case be dismissed.

## I.   BACKGROUND

In the wake of September 11, 2001, the federal government ordered decontamination at the Gulf Nuclear Site in Webster, Texas amid concerns that terrorists could use radioactive material at the site to create a "dirty bomb." The

United States Army Corps of Engineers contracted with Shaw[1] for radioactive clean up services at the site.  The sixteen individual plaintiffs worked for subcontractors of Shaw on the  project.

The most prevalent isotopes at the site were Americium-241 (Am-241) and Cesium-137 (Cs-137), but others toxic materials were also present.  Am-241 can be measured in urine, and it is undisputed that some level of this toxin is present in each plaintiffs' urine.  Plaintiffs complain of many ailments allegedly caused by their exposure to Am-241 and other radioactive materials at the site, including, among other things, dizziness, skin infections and rashes, ear and sinus infections, joint or bone pain, lumps or cysts, blood in urine, and headaches.  Cancer is *not* among the ailments cited.  Plaintiffs have sued Shaw for negligence, gross negligence, negligence *per se* based on violation of federal standards, and assault and battery.

## II.  **SUMMARY JUDGMENT STANDARDS**

Shaw moves for summary judgment on the following grounds:  (1) plaintiffs cannot meet their burden on causation;[2] (2) plaintiffs cannot recover for fear of cancer

---

[1]     The original contract was with IT Corporation.  Shaw acquired certain assets, including the Gulf Nuclear Site contract, in connection with IT Corporation's bankruptcy.  Other defendants are individual supervisors on the project.  The court refers to defendants collectively as "Shaw."

[2]     Shaw has also filed a motion to exclude the testimony of plaintiffs' expert, Marvin Resnikoff (Dkt. 80).  Shaw contends that summary judgment is appropriate even if Resnikoff's testimony is not excluded.  If this memorandum and recommendation is adopted by the
(continued...)

or increased risk of cancer in absence of compensable physical injuries; (3) some plaintiffs have submitted no evidence of their alleged injuries; and (4) the individual defendants acting in their capacity as employees are not subject to liability.

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)). If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In

---

[2]      (...continued)
district court, no ruling will be necessary on the motion to exclude.

determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255.

## III.   <u>ANALYSIS</u>

### A.   **Price Anderson Act Claims**

Both sides agree that plaintiffs' negligence claims are governed by the Price Anderson Act, 42 U.S.C. §§ 2210, *et seq.*, which creates a federal cause of action, known as a "public liability action," for claims of bodily injury arising out of radiation exposure.  42 U.S.C. § 2014(hh).  The federal substantive law to be applied in such actions is derived from law of the state where the alleged exposure occurred, in this case Texas.  *Id.*

Under the Price Anderson Act and Texas law, plaintiffs must show that (1) they were exposed to radioactive materials in excess of federal regulatory limits,[3] (2) they suffered injury, and (3) the radiation exposure caused their injuries.  *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) (federal regulatory limits establish the standard of care in public liability action); *Roberts v. Florida*

---

[3]     "The application of something other than the federal safety regulations as a standard of care is inconsistent with the Price Anderson scheme and consequently cannot be applied in a public liability action."  *O'Conner*, 13 F.3d at 1105; *Roberts*, 146 F.3d at 1308.

*Power & Light Co.*, 146 F.3d 1305 (11th Cir. 1998); *Merrill Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997). For purposes of this motion, the third element is the dispositive issue.[4]

### 1.    Causation in a Toxic Tort Case

Under Texas law, the plaintiff bears the burden of proving causation by establishing the two elements of proximate cause, *i.e.* cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be satisfied by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995). Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex. 1995). The quantum of proof required is preponderance of the evidence, that is, "more probable than not." *Southwest Key Program v. Gil-Perez,* 81 S.W.3d 269, 275 (Tex. 2002).

Causation in toxic tort cases is often analyzed in terms of general causation and specific causation. "General causation is whether a substance is capable of

---

[4]    Shaw does not move for summary judgment on the basis that plaintiffs' exposure was below regulatory limits, except as to plaintiff Timothy Petrie. Plaintiffs concede that their own evidence fails to prove that Petrie's exposure exceeded federal regulations, but argue that the standard of care should be a dose "as low as reasonably achievable," a standard known as ALARA, not federal regulations. Shaw contends that ALARA is not the standard of care in a Price Anderson Act case. The court need not address the standard of care issue because the causation issue is dispositive.

causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex. 1997). With many toxins, however, controlled human experimentation cannot be done, and direct evidence of specific causation will be unavailable. *Id.* at 714-15. In such cases, plaintiffs may attempt to show that exposure to the substance at issue increases the risk of their particular injury. One way of accomplishing this is through epidemiological studies, which examine existing populations to determine if there is an association between a disease or condition and a suspected causal factor. *Id.*; *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 817 (W.D. Tex. 2005). The utility and importance of such studies in toxic tort cases has been recognized by the Fifth Circuit. *Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307, 311 (5th Cir. 1989).

The Texas Supreme Court has held that properly supported and executed epidemiological studies showing increased risk can, under certain conditions, support a causation finding in a toxic tort case. *Havner,* 953 S.W.2d at 717. Those conditions include: (1) the increased relative risk shown by the studies is more than double that of the unexposed population;[5] (2) the claimant is similar to those in the

---

[5]     After finding a rational connection between the doubling of risk requirement and the "more likely than not" burden of proof, the *Havner* opinion hedges this requirement with qualifiers. 953 S.W.2d at 718 ("We do not hold, however, that a relative risk of more than 2.0 is a
(continued...)

studies, including exposure to the same substance, comparable or greater exposure or dose levels, exposure  prior to onset of injury, and timing of onset consistent with those in the study; and (3) there is evidence which excludes other plausible causes with reasonable certainty.   The court must determine the legal sufficiency of the causation evidence in light of all these factors.  *Id.* at 720.

*Havner* sets forth substantive Texas law on toxic tort causation, not merely procedural law on admissibility of expert testimony, and governs the issue of causation in this federal action.  *Cano*, 362 F. Supp. 2d at 821-22.

## 2.    Plaintiffs'  Expert Testimony

Plaintiff rests its case for causation on the expert testimony of Marvin Resnikoff.[6]  For purposes of this summary judgment motion, the court assumes that Resnikoff's expert reports and affidavit are admissible under *Daubert* standards.

---

[5]       (...continued)
litmus test. . ."); *id.* at 719 ("We need not decide in this case whether epidemiological evidence with a relative risk less than 2.0, coupled with other credible and reliable evidence, may be legally sufficient to support causation."); *id.* at 720 ("[A] claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk.").   Arguably then, *Havner* may be read to require a relative risk that is only "substantially elevated" rather than "doubled."   The point is academic here, however, because plaintiffs' proof does not satisfy either formulation, as shown below.

[6]       This court previously denied plaintiffs permission to designate an additional expert,  Dr. Kalpana Patel, several months after the designation deadline. *See* Dkt. 99.  Therefore, Shaw's motion (Dkt. 92) to strike the affidavit of Dr. Patel submitted by plaintiffs in opposition to summary judgment is granted.

Resnikoff earned a PhD in physics from the University of Michigan in 1965 and in 1973 was awarded a Fulbright Fellowship to research elementary particle physics at Universidad de Chile.  After several years working with public interest research groups and teaching, he founded a consulting company in 1989 called Radioactive Waste Management Associates.  He currently is a senior associate with that firm focusing on radioactive waste issues.  He has provided expert witness reports and testimony in numerous toxic tort cases (although apparently none relating specifically to Am-241), and has written or co-written a plethora of articles on radioactive and other environmental waste issues.[7]

Resnikoff has produced two expert reports for this case.  The first is dated January 26, 2007 and is generally referred to by the parties as his "Health Effects Report."  The second is dated March 30, 2007 and is generally referred to by the parties as his "Dose Report."

In preparing his Health Effects Report, Resnikoff reviewed the ailments described by plaintiffs in their complaint.  He noted that over 3 years after intake at the Gulf Nuclear Site, Am-241 was still present in the plaintiffs' urine, which indicated to him high original intakes.  He reviewed scientific literature regarding health effects due to radiation, and listed certain conditions that have been

---

[7] *See* Curriculum Vitae, Attachment A to Resnikoff's Health Effects Report, Shaw's Exhibit A.

documented in the literature from radiation exposure.[8] Because many of the plaintiffs are experiencing similar symptoms and "are showing a pattern for future disease consistent with the literature for people who have been exposed to radiation of the type present at the Gulf Nuclear Site," he concluded "the ailments described [by plaintiffs] could be due either to external or internal radiation and chemicals, such as ammonia."[9]

In forming his opinion that Am-241 "could have" caused plaintiffs' injuries, Resnikoff relied on five epidemiological studies, none of which address Am-241 specifically. Four of those epidemiological studies document the health effects of radiation exposure on Japanese bomb survivors.[10] Resnikoff further relied on a study relating to cancer mortality among nuclear industry workers.[11]

---

[8]   Much of Resnikoff's report addresses the literature on cancer effects of radiation, although as noted none of the plaintiffs have been diagnosed with cancer. *See* Health Effects Report, Shaw's Exhibit A, § VI, at 7-18.

[9]   Shaw's Exhibit A, Resnikoff Health Effects Report, § VII.

[10]   *See Id.* at 18-20, nn. 93-96 (citing Wong F.L., Yamada M., Sasaki H., Akiba S., Shimaoka K., and H. Yutaka, *Noncancer Disease Incidence in the Atomic Bomb Survivors: 1956-1986,* Radiation Research 135, p. 418-230[sic], 1993; Yamada M., Wong F.L., Fujiwara S., Akahoshi M., and G. Suzuki, *Noncancer Disease Incidence in Atomic Bomb Survivors, 1958-1998,* Radiation Research 161, p. 622-32, 2004); *Id.* at nn. 99-100 (citing Shimizu Y., Pierce D.A., Preston D.L., and K. Mabuchi, *Studies of the Mortality of the Atomic Bomb Survivors. Report 12, Part II. Noncancer Mortality: 1950-1990,* Radiation Research 152, p. 374-389, 1999; Preston D.L., Shimizu Y., Pierce D.A., Suyama A., and K. Mabuchi, *Studies of Mortality of Atomic Bomb Survivors: Report 13: Solid Cancer and Noncancer Disease Mortality: 1950-1997,* Radiation Research 160, p. 381-407, 2003).

[11]   *See Id.*, n. 98 (citing Cardis E., Gilbert E.S., Carpenter L., et al., *Effects of Low Doses and*
(continued...)

Resnikoff's Health Effects Report does not contain an opinion that plaintiffs' conditions "more likely than not" were caused by Am-241.   For that purpose, plaintiffs rely on Resnikoff's Dose Report based on bioassay testing of urine samples which indicates that plaintiffs were exposed to levels of Am-241 in excess of federal regulatory limits and still have Am-241 present in their bodies.

### 3.     Application of *Havner* Standards to Resnikoff's Testimony

Shaw argues that the opinions of plaintiffs' expert based upon his review of epidemiological studies fail as a matter of law to meet *Havner's* requirements for proof of toxic tort causation.

***Doubling of risk***.   As explained by *Havner*, in order for epidemiological studies to raise a genuine issue as to whether radiation exposure caused plaintiffs' injuries, the studies must indicate a doubling of the risk to exposed persons as compared to the general population.   Resnikoff did not perform such a risk assessment.[12]   In his words, "[w]e generally calculated the dose . . . and we didn't . . .

---

[11]     (...continued)
*Low Dose Rates of External Ionizing Radiation: Cancer Mortality Among Nuclear Industry Workers in Three Countries*, Radiation Research 142 p. 117-32, 1995).

[12]     Resnikoff's supplemental affidavit indicates that he did perform a risk assessment for Cotroneo and determined that there was a 77% likelihood that he will develop cancer.   Sept. 26, 2007 Aff., ¶¶ 20-26.   However, Resnikoff explains that the models for determining the assigned share of risk associated with radiation are designed to assess risk in individuals who have cancer.   Cotroneo has not been diagnosed with cancer; Resnikoff's opinion is based on the speculative assumption that he will be.

go to the next step, which is to look at the risk."[13]   Resnikoff explained that there is
no methodology for analyzing risk for non-cancer effects of radiation.

It is undisputed that plaintiffs do not have evidence that plaintiffs' radiation
exposure put them at twice the risk (or even a substantially elevated risk) of
developing their injuries than the general population.   Resnikoff does not give an
opinion as to such a correlation.   Therefore, Resnikoff's opinion based on these
epidemiological studies is insufficient to create a genuine issue of material fact on
causation.

***Plaintiffs' similarity to subjects of epidemiological studies*.**   In order for
epidemiological studies to be probative of causation under *Havner,* plaintiffs must
show that they were "exposed to the same substance, that the exposure or dose levels
were comparable to or greater than those in the studies, that the exposure occurred
before the onset of injury, and that the timing of the onset of injury was consistent
with that experienced by those in the study."   953 S.W.2d at 720.

Resnikoff concedes the studies he relies upon do not address Am-241
specifically, but says some of the studies do address alpha radiation.   Yet, Resnikoff
does not explain how studies of cancer and mortality from alpha radiation are relevant
to determining non-cancerous, non-mortal health effects such as those alleged by

---

[13]      *See* Resnikoff Depo., at 71-72

11

plaintiffs.  Nor does his opinion account for the fact that health effects from Am-241 vary based on route of exposure (i.e., inhalation, oral, or dermal or other).[14]  Resnikoff defends his reliance on studies involving gamma radiation exposure in atomic bomb survivors by saying only that "since alpha radiation is a more potent form of radiation than gamma radiation, my examination of all the studies noted above was reasonable in light of the fact that the plaintiffs in the instant case were exposed to both alpha and gamma radiation, and also neutron radiation, during their employment at the Gulf Nuclear Site."[15]  However, Resnikoff does not address important differences between gamma and alpha radiation, such as that alpha radiation cannot permeate the outer layers of the skin, and that alpha radiation produces a localized dose, while gamma radiation contributes to a larger distribution of dose.[16]  Resnikoff further does not address whether the timing of the onset of plaintiffs' conditions is consistent with the studies.

In response to Shaw's motion for summary judgment, Resnikoff has referred for the first time to the Toxicological Profile for Americium, prepared by the Agency

---

[14]     ATSDR report, Section 3.2 ("Discussion of Health Effects by Route of Exposure"), at 17-30.

[15]     September 26, 2007 Affidavit of Marvin Resnikoff, PhD, ¶ 11, submitted with plaintiffs' supplemental brief (Dkt. 100).  Plaintiffs only evidence of radiation exposure in excess of federal regulatory limits relates to Am-241.

[16]     ATSDR report, at 15-16.

for Toxic Substances and Disease Registry in April 2004 (ATSDR report).[17]   His summary judgment affidavit states "[u]pon further review of the ATSDR Americium study, I have confirmed the health effects experience [sic] by Plaintiffs are consistent with Americium exposure."[18]   But the ATSDR study offers little support for this sweeping conclusion.  Information regarding human exposure in the ATSDR report is limited to a single case of a 64-year old man exposed when an ion-exchange column containing about 100 g of Am-241 exploded in his face.   Health effects information in the ATSDR report is primarily derived from animal studies involving exposures to high doses of ionizing radiation from uptake of Am-241. While animal studies may be relevant to assessing human health effects, Resnikoff does not compare the doses involved in the animal studies to the doses of these plaintiffs.  For all of these reasons, Resnikoff's report fails to satisfy the *Havner* similarity criterion.

***Negation of Other Plausible Causes***.  A final glaring defect in plaintiffs' proof is the failure to rule out other plausible causes for their ailments.[19]   *Havner*, 953

---

[17]     The ATSDR report was not attached to Resnikoff's Affidavit.  Shaw supplied a copy of this report to the court pursuant to its request at the September 21 hearing.  The report is lengthy, but the court's citations are specifically to Section 3.  The court has directed the clerk to docket Section 3 of the ATSDR Report as a supplemental exhibit. The entire ATSDR Report is available for viewing or download at http://www.atsdr.cdc.gov/toxprofiles/tp156.html.

[18]     August 17, 2007 Affidavit of Marvin Resnikoff, PhD, ¶ 79 (Dkt. 86).

[19]     The Dose Report indicating the presence of Am-241 in plaintiffs' bodies is evidence of exposure; it is not evidence of causation.  Resnikoff summarized the issues addressed in his Dose Report as follows:  "1) how much Am-241 was inhaled, and 2) what was the likely
(continued...)

S.W.2d at 720. The types of injuries alleged by plaintiffs are common in the general population.[20] Resnikoff conceded in his Health Effects report as well as in his deposition that plaintiffs' injuries could be caused by things other than radiation.[21] Resnikoff is not a medical doctor, and did not review plaintiffs' medical records. Resnikoff did not do an analysis of whether plaintiffs' injuries "more likely than not" were caused by exposure to Am-241.[22] Plaintiffs simply have no expert testimony or other evidence that excludes other possible causes of their injuries with reasonable certainty.[23]

---

[19]     (...continued)
         radiation dose[,] 3) [w]hat was the likely direct gamma radiation dose due to Cs-137 and other radioactive materials[,] and 4) [d]o these radiation doses exceed regulatory limits? Dose Report, at 9. He does not discuss causation.

[20]     The conditions identified in Resnikoff's Health Effects report are: throat irritation, dizziness/vertigo, liver ammonia, skin infections/rashes/exposure, high blood pressure, hair loss, enlarged prostate, ear infections, sinus infections/problems, gallstones, polyps in throat, nodules on vocal cords, aggravated allergies/asthma, joint or bone pain/problems, vomiting, dehydration, teeth problems, lumps/cysts, depression, irregular menstrual cycles, rectal bleeding, infertility, anemia, heart palpitations/chest pains, blood in urine, kidney stones, bloody noses, stress/anxiety attacks, extreme fatigue, numbness, mole discoloration, sleeping difficulties, and headaches.

[21]     Health Effects report, at 6 ("ailments described by the Plaintiffs . . . can be attributed to either radiation or chemical reactions"); Resnikoff Depo., at 61 (stating it is possible that plaintiffs' symptoms have other causes.).

[22]     Resnikoff Depo., at 135-37.

[23]     It should be noted that this defect would not have been cured even by the proffered testimony of plaintiffs' late-designated expert, Dr. Patel. Her affidavit (Dkt. 87, ¶ 67) acknowledges other possible causes for plaintiffs' disorders, yet offers no evidence "excluding those causes with reasonable certainty," as *Havner* requires. 953 S.W.2d at 720.

For these reasons, the court concludes that plaintiffs have failed to offer legally sufficient proof under *Havner* that radiation exposure at the Gulf Nuclear Site caused their bodily injuries, and Shaw is entitled to summary judgment on plaintiffs' negligence causes of action governed by the Price Anderson Act.

## B.     Assault and Battery Claims

Shaw's summary judgment motion did not separately address plaintiffs' assault and battery claim, apparently assuming that all of plaintiffs' claims were subsumed by the Price Anderson Act and that a favorable ruling on causation would likewise negate any such tort claim. After questioning from the bench at the hearing, however, the parties requested and were granted the opportunity to file supplemental briefs on the separate viability of an assault and battery claim under Texas law. In that briefing Shaw argues that the assault and battery claim would be inconsistent with, and therefore preempted by, the Price Anderson Act.[24] Plaintiffs respond that such claims fall outside the scope of the federal law, and should proceed to trial even if the federal claims are denied.

There are three varieties of assault and battery claims under Texas law: (1) intentionally, knowingly, or recklessly causing bodily injury to another; (2) intentionally or knowingly threatening another with imminent bodily injury; or (3)

---

[24]     Shaw expressly pleaded preemption in its answer (Dkt. 55, ¶ 130), and plaintiffs have not challenged Shaw's right to assert this defense on summary judgment.

intentionally or knowingly causing physical contact with another when the person

knows or should reasonably believe that the other will regard the contact as offensive

or provocative. *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W. 3d 636, 649-50

(Tex. App. Houston [1st Dist.], 2005, pet. denied).  Plaintiffs assert the first and third

types of assault and battery here, conceding that the second type does not fit the facts

alleged.

Defendants are correct that the first type of assault and battery claim is

foreclosed by the plaintiffs' legally insufficient proof of causation.  An indispensable

element of this type of assault and battery claim is an act "causing bodily injury."

*Forbes v. Lanzl*, 9 S.W.3d 895, 900 (Tex. App.– Austin 2000) (pet. denied).[25]  Any

Price Anderson Act claim likewise requires proof that radiation caused bodily injury.

Plaintiffs' inability to offer legally sufficient proof that their bodily injuries were

caused by radiation necessarily precludes any recovery on a claim of assault and

battery based upon  "bodily injury."

That leaves the third type of assault and battery, defined as "intentionally or

knowingly caus[ing] physical contact with another when the person knows or should

---

[25]     "Bodily injury" is defined by statute to mean "physical pain, illness, or any impairment of
physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8).  In Texas, the definition of assault
is the same, whether in a civil or criminal proceeding.  *Forbes,* 9 S.W.3d at 900;; *Hall*, 177
S.W.3d at 649.  Plaintiffs do not argue that the Price Anderson Act employs the term "bodily
injury" in a different sense than Texas law does.

reasonably believe that the other will regard the contact as offensive or provocative."[26]  By its own terms,  this form of assault does not require bodily injury, but merely "offensive or provocative" contact.[27]  The gist of this tort is not actual bodily harm but rather the offense to the dignity of the assaulted person.  *Moore v. Lillebo*, 722 S.W.2d 683, 685 (Tex. 1986) (citing *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex. 1967));  *see Swope v. Columbian Chem. Co.*, 281 F.3d 185, 196 (5th Cir. 2002) (recognizing battery claim under Louisiana law based on exposure to excessive ozone).

Shaw maintains that an "offensive contact" battery claim should be disallowed or preempted because it is "inconsistent" with the Price Anderson Act. The statutory basis for this argument is the following provision of the Act:

> The substantive rules for decision in [a public liability action] shall be derived from the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section.*

---

[26]   TEX. PENAL CODE ANN. § 22.01; *Hall*, 177 S.W.3d at 649-50.

[27]   The court has not found a Texas Supreme Court case expressly recognizing a claim of assault and battery from radiation exposure where the plaintiff has no existing bodily injury.  But at least one Texas appellate court has allowed such an action to proceed.  *Kielwein v. Gulf Nuclear, Inc.*, 783 S.W.2d 746, 747 (Tex. App. [14th Dist.] 1990, no pet.) (holding employee's assault and battery claim alleging anxiety, mental pain and anguish, and insomnia arising out of an incident involving radioactive material at the Gulf Nuclear site was not barred by workers' compensation coverage; reversing summary judgment in favor of employer due to fact issues as to employer's intent).

42 U.S.C. § 2014(hh) (emphasis supplied).  But an examination of the balance of the Act fails to disclose any inconsistency.

As previously discussed, the Price Anderson Act creates a federal cause of action known as a "public liability action." "The term 'public liability' means any legal liability arising out of or resulting from a nuclear incident," with certain exceptions not applicable here.  42 U.S.C. § 2014(w).  A "nuclear incident," means, in relevant part, any occurrence causing "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material."  *Id.* § 2014(q).

Shaw argues that because a nuclear incident requires bodily injury, any state law claim that does not require bodily injury is inconsistent with the Act and thus preempted.  Shaw's argument is most fairly characterized as conflict preemption.[28] Conflict preemption occurs when either (1) a provision of state law is incompatible with a federal statute such that compliance with both is a "physical impossibility" or (2) the application of state law would disturb, interfere with, or seriously compromise the purposes of the federal statutory scheme.  *Morgan City v. South La. Elec. Coop.*

---

[28]   There are three ways in which federal law preempts state law:  express preemption, field preemption, or conflict preemption.  *AT&T Corp. v. Public Utility Comm. of Texas*, 373 F.3d 641, 645 (5th Cir. 2004).  Shaw does not label the type of preemption it advocates.

*Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  Defendants do not seriously contend that such a common law battery claim would be so incompatible with a Price Anderson Act public liability action that coexistence would be impossible.  Nor do they explain how such a state law battery claim disturbs, interferes with or seriously compromises the statutory scheme.

The fact is that an offensive contact battery claim falls outside the carefully delineated scope of a Price Anderson Act public liability action, which by its terms applies to specific types of cases, *i.e.*, those arising out a nuclear incident.  *In re Hanford Nuclear Reservation Litigation*, Nos. 05-35648, 05-35651, 05-35678, 05-35866, 05-35892, 05-35895, 06-35165, 2007 WL 2302365 *16 (9th Cir. Aug. 14, 2007) ("the PAA is the exclusive means of compensating victims for any and all claims arising out of nuclear incidents.").  The first question the court must decide is whether plaintiffs' case arises out of a nuclear incident.  *See O'Conner*, 13 F.3d at 1100; *Corcoran v. New York Power Authority*, 935 F. Supp. 376, 384-85 (S.D.N.Y. 1996).  The statutory definition of "nuclear incident" is limited to occurrences causing certain types of injury, including "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property."  42 U.S.C. § 2014(q).  Because the offensive contact battery claim does not entail the type of injury listed by the statute, it does not arise out of a "nuclear incident" as defined by the Act.

In drafting this legislation, Congress was presumably aware that other forms of harm, *e.g.*, mental anguish or emotional distress, would fall outside the scope of the Act, and hence beyond its reach.   To preclude such state law claims as "inconsistent" with the Act would be tantamount to re-writing the carefully defined boundaries of this statute, which this court declines to do.[29]

Shaw's other arguments against allowing plaintiffs' offensive contact battery claim to proceed do not require extended discussion.   While it is true that the Texas Supreme Court has not explicitly recognized a battery cause of action in the toxic tort context, such a claim would not be precluded by that court's holding in *Temple-Inland Forest Prods. Corp. V. Carter,* 993 S.W.2d 88 (Tex. 1999).   That case specifically addressed the requirement for bodily injury in a negligence claim, not an intentional tort claim.  993 S.W.2d at 92 ("*absent intent* or malice on defendant's part, mental anguish damages are only allowed in a few types of cases" (emphasis added)).  Nor is this court swayed by Shaw's argument that plaintiffs' consent to occupational exposure bars any assault and battery claim.  As radiation workers, plaintiffs accept the risk of some level of radiation exposure, but it does not follow that they necessarily consented to all the exposure they received.  As a factual matter, given the

---

[29]     This is not inconsistent with *In re Hanford*, relied upon heavily by Shaw.  The Ninth Circuit held in *Hanford* that medical monitoring claims were not compensable under the Price Anderson Act.  2007 WL 2302365, *16.  But that case did not discuss whether state law *intentional* tort claims that do not require bodily injury are preempted by the Act.

nature of plaintiffs' jobs, it may be that in order for a jury to find the exposure was offensive, or that Shaw knew or reasonably should have known it would be offensive, the exposure must have exceeded federal regulatory limits.  But that is not an issue for this court to resolve on summary judgment.

Accordingly, plaintiffs' state law assault and battery claim based on offensive contact is not preempted by the Price Anderson Act.  However, it is purely a state law cause of action.  Whether the court should exercise supplemental jurisdiction over this claim despite the dismissal of the federal cause of action is the final question to be addressed.

## C.    Supplemental Jurisdiction

When, as recommended here, all federal claims are eliminated from a case removed from state court, the district court has discretion to retain jurisdiction, to remand, or to dismiss remaining state law claims.[30]  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351-54 (1988).  While not mandatory, it is normally appropriate to decline supplemental jurisdiction over such state law claims once the court dismisses all claims over which it has original jurisdiction.[31]  *Priester v. Lowndes Cty.*, 354 F.3d

---

[30]    *See Ingram v. Papa John's Int'l, Inc.*, 171 Fed. Appx. 439, 441 (5th Cir. 2006) ("Having disposed of the two claims on which removal jurisdiction was premised, under § 1367(c)(3) the district court had complete discretion whether to dismiss, without prejudice, the supplemental state law claims.  Its exercise of that discretion was proper.").

[31]    Complete diversity of citizenship does not exist in this case.  *See* Third Amended Complaint, (continued...)

414, 425 (5th Cir. 2004); *Wong v. Stripling,* 881 F.2d 200, 204 (5th Cir. 1989).  In fact, the supplemental jurisdiction statute expressly authorizes the district court to decline jurisdiction in such a circumstance.[32]  28 U.S.C. § 1367(c)(3).

The supplemental jurisdiction statute also authorizes the court to decline jurisdiction over a claim which "raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  While assault and battery has a venerable history at common law, its application in the toxic tort context does present novel legal issues not previously addressed by the Texas Supreme Court.  While  one Texas intermediate appellate court  has implicitly recognized the viability of such a claim,[33] the liability standards (*e.g.*, how much  toxic exposure constitutes an "offensive touching") and possible defenses (*e.g.*, whether and to what extent a radiation worker has "consented" to the exposure) are barely addressed, if at all, in Texas case law.  In short, this is undeveloped  state law terrain where federal courts should fear to tread.

The doctrine of supplemental jurisdiction is designed to accommodate the values of economy, convenience, fairness, and comity.  *Cohill*, 484 U.S. 343, 351-52

---

[31]     (...continued)
¶¶ 5-32.

[32]     The supplemental jurisdiction statute also permits the district court to decline jurisdiction even though the federal claims are not dismissed, if the state law claim "substantially predominates" over those federal claims.  28 U.S.C. § 1367(c)(2).

[33]     *See Kielwein v. Gulf Nuclear, Inc.*, 783 S.W.2d 746, 747 (Tex. App. [14th Dist.] 1990, no pet.).

(1988). In this case, the court concludes that the best way to accomplish these values is to decline to exercise jurisdiction over plaintiffs' remaining state law cause of action. The question thus becomes whether to dismiss the claim without prejudice, or to remand it back to the New York state court from which it was removed, as plaintiffs have requested.

Unlike the usual case removed pursuant to 28 U.S.C. § 1446(a), this case was not filed in a state court that lies within this district and division. The Price Anderson Act provides for removal to the United States District Court in which the alleged nuclear incident occurred. 42 U.S.C. §2210(n)(2). Plaintiffs initially filed this case in New York state court. New York has no connection to the events giving rise to the case beyond being the current residence of some plaintiffs and some individual defendants. The exposure occurred in Texas and plaintiffs' claim is governed by Texas law. Remanding a tort claim under Texas law for resolution by a New York state court would hardly advance the declared values of economy, convenience, fairness, or comity.

Prior to the passage of the supplemental jurisdiction statute in 1990, remand was often a preferred option because it avoided a potential problem if the statute of limitations had expired while the claim was pending in federal court. *See Cohill,* 484 U.S. at 352 n.10. This problem has been alleviated by 28 U.S.C. § 1367(d), which

tolls the statute of limitations from the date the claim was filed  for a period of 30 days following dismissal.  Dismissal will not foreclose plaintiffs' ability to litigate their assault and battery claim in state court.  Indeed, nothing in this opinion would preclude the plaintiffs from timely refiling this claim in New York state court if they wish, but of course this court ventures no opinion about the propriety of such a filing under New York law.

Dismissal of plaintiffs' remaining  assault and battery claim is therefore the most suitable exercise of the court's discretion.

## IV.    <u>CONCLUSION AND RECOMMENDATION</u>

For the reasons discussed above, the court recommends that Shaw's motion for summary judgment on plaintiffs' Price Anderson Act negligence claims and "bodily injury" assault and battery claim be granted.

The court further recommends that Shaw's summary judgment motion on plaintiffs' state law "offensive contact" assault and battery claim[34] be denied.

The court finally recommends that the court decline to exercise supplemental jurisdiction over plaintiffs' remaining assault and battery claim and dismiss it without prejudice to refiling in state court.

---

[34]    Plaintiffs' third amended complaint, ¶ 118.

The parties have ten days from service of this Memorandum and Recommendation to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* FED. R. CIV. P. 72.

Signed at Houston, Texas on October 25, 2007.


Stephen Wm Smith
United States Magistrate Judge

25